Mangrove Partners Master Fund v. Bristol-Myers. Good morning, Your Honors. May it please the Court. When Defendant Cofario negotiated the merger agreement between Bristol and Celgene, he gave Bristol 6.4 billion reasons to slow-roll the approval of LysoCell past its approval date. Can I ask you, Mr. Eisenhoff, just to raise the podium just a little bit, or the microphone, one or the other? Yep. Yeah, I'm having a little difficulty hearing. Thank you. Absolutely. The market was aware of this misaligned incentive, and so in the merger documents and throughout the class period, defendants repeatedly represented to the market that they would use their full diligence to get the drugs approved by their approval dates. Despite these representations, the FDA approval process for LysoCell suffered abnormal error after abnormal error. Bristol did not submit a portion of the FDA application. They did not respond to the FDA in a timely fashion, instead waiting weeks when response should normally take days, and they assigned junior people to tasks that were normally undertaken by teams of senior people with foreseeable consequences. As a result of all these delays, LysoCell missed its target approval date by 36 days. Bristol did not have to pay $6.4 billion, which was about 90% of its income for that entire year. And plaintiffs alleged that the most plausible, and certainly at least as plausible as other explanations for this series of events, was that Bristol was acting in accordance with the economic incentives that it itself created, and slow-rolling the approval process for LysoCell slightly past the approval date. Defendants have put... Let me ask you something. Of course. Is it necessary to sustain your side of the case to conclude that the complaint is sufficient with respect to the motivations ab initio, as of the time of the issuance of the security in the very, very beginning, or is your side of the case sufficiently supported if one finds that in the last couple of months, the period between September and the end of the year, when the axe was coming down, and the thing was closing, if one finds that at that time, the complaint adequately pleads a decision on the part of Bristol Myers Management to not rush things that much, slow it down? Both would be acceptable, but we get different statements. So if, as we allege, the scheme was hatched when the deal was designed at the beginning of the class period, then all the statements would be false misleading. If they were reacting opportunistically and said, oh, we're so close, if we just delayed a little bit more... How many statements do you need to prevail in your case? Well, we only need one statement to prevail, to go back, to be reversed, but damages, obviously, is dependent on who was buying and selling at different points during the class period. So it would be different coverage. The class period would be different. But as to whether there's sufficiency of the complaint, the complaint would be sufficient if you failed to show that there was a decision as of the beginning. Oh, we're issuing this paper, but there's no way it's going to ever cost us a cent, because we're just not going to see to it that the thing isn't approved on time. Even if you don't plead that adequately, you still have a case if you plead that in September or October, they made statements about they were on track when they knew they weren't on track and were not intending to conclude on track. That is correct, Your Honor. Which statements would those be, if it's a September or October time frame for which the fall city arises? What statements would you look at? Sure. They made statements pretty much continuously throughout the class period that were very similar. So in September 17th, defendant Coforio said, I would say the overall process of the FDA is going well. We're working very actively with the FDA to keep the review and inspection process moving. On September 21st, defendant Herowat, who's the chief medical officer, said, we continue to work with the FDA in terms of scheduling inspections. And then again, he says, at this time, Lysel is on track to meet its approval goals. And then even at the very end of the class period, on November 16th, 2020, Bristol itself issues a press release stating that Bristol continues to work closely with the FDA and is committed to bringing Lysel to patients. The company is committed to working with the FDA to progress both applications to achieve the remaining regulatory milestones required by the CVR. So they basically took the same statements and repeated them throughout the class period, telling the market, we're being diligent, we're doing the right thing here, we are not acting in accordance with the odd incentives that we did ourselves set up. And the only other explanations that defendants put forward as being plausible are, one, they say it was COVID. But we've done an apples-to-apples comparison of all other drugs that were similar during the same time period, also affected by COVID. Lysel was by far the longest application. And second, the delays we're complaining of are not putting information in an application, not taking a long time to respond to the FDA. The FDA, COVID didn't fail to fill out the application properly. COVID didn't assign a junior person to a senior person's job. And COVID didn't take a long time to respond to an inquiry by the FDA. It did, I think, delay the lab inspections, right? Yes, but those were delays we did not mention as artificial in our complaint. However, the fact that during the lab inspection, they found that the bins were mislabeled. And then at the next lab inspection weeks later, those bins were also mislabeled. I'm not sure I find what you're saying now very persuasive, because you say COVID didn't repeat. What was it you said? I said COVID didn't fill out the application correctly. Yeah, yeah. But the thing about COVID is that COVID turned everything upside down. People were no longer working in the offices during COVID. People were working from home. They were dispersed. The amount of dislocation that COVID caused is hard to describe and hard to get a handle on. It just threw everything into a cocked hat and imposed a disorganization that is very hard to estimate the effect of. That is true, Your Honor. But at this pleading stage, all we have to do is show that our explanation is at least as plausible as this. And with COVID, Bristol was doing many other drug approval processes during the same time period. They were all going fine. It was just this one drug that suffered mishap after mishap after mishap. There's another thing that was different about this one than at least almost all the others, which is that this was a case, and maybe there was one similar, but you can't really – this was a case in which the company seeking the approval of the drug during this COVID period was dealing with a drug and the facilities for manufacture of the drug, which it had just recently acquired. So it was not on top of that drug, on top of all the history of the manufacturing process and so forth, and it was not on top of the facilities because it had just acquired them. I know there was one other company that was approved during that time where there was also a recent acquisition, but one doesn't know to what extent the persons pursuing the application were the persons from the acquired company or the persons from the acquiring company that were new to the whole business. There are a lot of unknowns at this point in litigation. That is true, and I cannot eliminate a negative like that, but I can say that it is just as plausible that these abnormal mistakes, which were not normal for the industry, not normal for Bristol, not normal for any other drug that was going through the approval process at this point in time at Bristol or any other company, might just not be absent, especially with the mass incentive that was there for this drug and its two sibling drugs and no other ones. With regard to the statements in September and October, is the theory that at the time those statements were made, the defendants were not, they were knowingly not exercising due diligence? They were sabotaging the approval of the drug? Is that the claim? Yes. So that remains true throughout with regard to all your allegations? Yes, and I would like to point out that once one mistake happened, this is a blockbuster drug for non-Hodgkin's lymphoma with enormous implications. When one mistake was made, they didn't put in a new team. They didn't say, oh my gosh, let's really focus on this. These mistakes kept happening, and these defendants had the power to put in place more people, better people to make sure things didn't happen. They didn't correct the errors. They just let them compile and compile and compile and compile until the deadline passed. Why isn't corporate mismanagement sort of plus COVID and the post-merger circumstance just as plausible, more plausible than malfeasance, that action? Just as plausible, we're okay with, because that moves us past the. I understand, I understand. But it's not more plausible because, well, first of all, mismanagement of this level would rise to the level of recklessness, and also it's just too many errors. One, we wouldn't be pleading a case. Two, we have nine errors, and we have a massive, unusual incentive here at the same time. So I think that it's at least as plausible that defendants acted in their own economic self-interest. It's not irrational. They made the rational choice to delay the approval slightly, and I think that it's equally plausible. Well, you have evidence pleaded in your complaint. You have evidence pleaded in the complaint that the senior management would have been well aware at this September time that the inspection for which they were preparing, the next stage for which they were preparing, which was to come just two weeks away, a week or two away of the inspection of the facility, that you have a lot of evidence pleaded in the complaint that they were aware that that facility was in a bad state. Yes, Your Honor, we did, and they did not correct those. When they said we're on track, and in the week or ten days before that inspection took place, they didn't deal with the inadequacy and the bad condition of the facility. That is correct, Your Honor. And there were problems, there were significant omissions from the 483 report. I mean, what seems to me to be potentially significant is that at this date in late September, if they don't get it together for that inspection a week later, that is a catastrophe if you regard not meeting the inspection date as a catastrophe, but if you regard it as a gaining of $6.3 billion or over $6 billion, it's not such a catastrophe. I agree with you entirely, Your Honor. As to the other, I guess— My point is that saying we're on track at that time is very different from saying we're on track a year earlier. That is true. You have a lot more runway a year earlier, and at that point, it's do or die the last couple weeks. And a year earlier, you are on track. Yes, you are on track, except you're omitting the fact that you have a plan not to be on track. If you did, but you didn't necessarily have that plan a year earlier. That's correct, Your Honor. We don't know that at this point. The other explanation that defendants give for an alternative explanation is that Bristol would never do this because they might get sued. And that was also adopted by the district court. But this doesn't make any economic sense, and it's also contrary to a decision by this court. So whenever a company breaks a contract, it could be sued. But sometimes it's economically rational to do so. I mean, A, they could get away with it. We already got dismissed below, so you can get home free. But even if you don't, chances are the settlement is going to be for far less than $6.4 billion. So it's economically rational to break the contract. So I don't believe that is a plausible alternative explanation either, or one that's certainly not more plausible than the one we put forward, which is that. Did you sue in contract as well? No, just a securities fraud suit. There is another suit that's contract. That's what I'm asking. There was another suit? Yeah, different plaintiff, different case, which has been temporarily dismissed because of standing issues. But there is a breach of contract suit as well. If no further questions. Good morning, Your Honor. May it please the court. I'd like to start with the last point first. This is a breach of contract suit dressed up as a securities fraud class action, and plaintiffs failed to state a claim as Judge Furman correctly ruled below. And it's two very well-reasoned opinions. There's a lot of discussion in the plaintiff's presentation about plausibility. But there are two standards here, Your Honors. One, plausibility, obviously, Iqbal and Twombly. But two, the PSLRA required the plaintiffs to plead with specificity. Each statement that they claimed was false or misleading and facts giving rise to a strong inference of scienter. They did not offer a single contrary fact for the entire class period that conflicted with the statements listed in the complaint. The statements were accurate discussions about the status of the FDA approval process for Lysosel. They began with the registration statement circulated for the merger vote in February 2019, which was nine months before BMS had a single thing to do. Well, I mean, in this case, this is kind of unusual as to the relationship between scienter and falsity. Because usually falsity is one fact and scienter is a completely different fact having to do with whether the people were aware of the fact that was untrue. But here, the falsity and the scienter are identical to one another. The thing that's being claimed to be false is the claim that we are, in good faith, working with the FDA towards the timely completion of the approval process. When in their mind, they're saying, no, we are not working toward that. We are working towards the contrary, towards missing the date. It's all what renders it false is what's in their mind. So I don't think I can agree with you that they haven't alleged any contrary fact. The contrary fact that they're alleging is the intention not to have the process where they say, we're on track and we're working closely with the FDA to get it done on time. The true fact, according to the allegation, is we're not working closely with the FDA to get it approved on time. We are, in fact, slowing things down so that it won't be approved on time. Well, Your Honor, I'd love to explore that point for you. What are the facts that the plaintiffs have offered to suggest that there was that hidden, undisclosed intent? And the answer is none. They have the all-or-nothing structure of the CVR agreement, which was negotiated at arm's length with Celgene in a very hotly negotiated merger, which the plaintiff, in his complaint, alleges was a difficult negotiation. They have alleged setbacks in the approval process that happened almost two years after the merger agreement. They have the fact that BMS did not buy back CVRs in the market when their complaint itself, which is the source of that allegation, is an analyst report from November 2019, which says BMS said it wasn't going to do that because of concerns about information asymmetry. That's in the complaint. They have confidential witnesses whose comments are unmoored in time and who are talking about one of two facilities. So Your Honor asked questions about the facility that was inspected in October. That was the facility that had been owned by Celgene, the Juno facility in Seattle. The confidential witnesses in the complaint are talking about a third-party manufacturer facility owned by Lonza that was not inspected until December. So the idea that those confidential witness allegations suggest some kind of conflict between what was going on in Lonza in September and what the defendants were saying, which was not that they were using diligent efforts, but just that they believed that the application was on track, which, by the way, is a classic opinion under Tongue v. Sanofi. Those allegations do not conflict with the statements that are in the complaint. The statements in the complaint say, we feel good about the process. Well, they had reason to feel good. The application had been filed, had been accepted by the FDA on the regular schedule, and, by the way, the application was approved. This isn't a case where the application was denied. The application was accepted and approved under Philip Morris. That's conclusive. Do we feel good about the process? Yes, we got it approved. Was it approved by December 31st? Unfortunately not.  Because of COVID. Am I making that up? No. The FDA announced in March of 2020 that they were suspending most of their inspection activities. That's a judicially noticeable fact. The complaint recites statements that say the problem that we're having is that the FDA is concerned about the safety of their staff, and, therefore, we can't inspect these facilities. Then, when the FDA said, we are going to require on-site inspections to approve this, and one of those inspections hadn't happened, what happened? Did BMS hide that fact? No. BMS disclosed it in its third-quarter earnings release that's in the complaint, and it disclosed it in the 10-Q. The PDUFA date was only 11 days away, and they still hadn't done one of these inspections. That was the problem. The reason was because the FDA couldn't travel to Houston to do the inspection, not because somebody had a scheme not to pay the CVRs, and that is a far more plausible inference to draw than that a major global pharmaceutical company would develop a scheme to intentionally subvert a contract that it agreed to in a public company merger for $75 billion. That doesn't make sense. This was one component of a very large public company merger. The people who owned CVRs were BMS stockholders. They were Celgene employees who were working on these applications. The allegations about the confidential witnesses show that BMS was working hard to address the issues at that Lanza facility. Can I ask, so you said the COVID interruptions is a more likely explanation. So I think they counter that with allegations sort of of a kind of a regression analysis or an analysis that there weren't comparable delays during COVID for other approvals. So, you know, on the pleading standard, how do you understand those allegations with respect to an assessment of which is a more plausible explanation? Well, Your Honor, under the Bristol-Myers case, this court decided, which I believe the Supreme Court is going to follow in NVIDIA, that expert opinion about whether it was a statistical anomaly for Lysacel to be approved on the timing it was compared to other applications is not, it's an opinion. It's not a fact. And, in fact, it's mistaken, but I'm not going to take issue with the facts in the complaint. It's just an opinion. Under the PSLRA, this court needs to look at particularized allegations of fact. The fact that one expert who's not even named, who hasn't explained his or her methodology, who has said that this is a statistical anomaly is not a particularized allegation under the PSLRA. So if the complaint included the details that you just suggested, here's my method for running the analysis and comparison, and I'm an expert in this area and all of these things, so that you have a supported allegation of a lack of comparable delay, and maybe you've got an expert who says something else or critiques the way the analysis is done, would that be sufficient if there were more disclosure of the methodology of the expert? I don't think so, Your Honor. I think what you see, for example, in NVIDIA is the Ninth Circuit said, we're going to reverse because there are two key components here. One is the plaintiffs have pleaded with particularity based on two confidential witnesses, that the statements they challenged were false at the time because the senior management knew that they were overstating or understating the reliance on cryptocurrency mining for their gaming category at NVIDIA. And in addition, their expert looked at the financial statements and concluded that that was what was happening. So it's not just the expert report. There is no similar fact here. There is no particular fact here. And in fact, Your Honor, every application is different. For example, one of the competing products to Lysacel is called Takardas. That was approved during the pandemic. However, the sponsor's manufacturing facilities for that application had been inspected by the FDA before the pandemic for another application, for Yaskarta. And therefore, the FDA did not need to do on-site inspections for those facilities, whereas neither of the Lysacel facilities had been inspected before. Now, this is getting a little bit into the weeds, but the Court asked that question. Those are the facts. That's why that expert opinion is entirely unreliable. They're not comparing apples to apples. They're comparing apples to oranges. There's not equivalence. That's why experts should be viewed skeptically at the pleading stage, because we're constrained. We need to accept the well-pleaded allegations of fact. We can't explain to you why that statistical anomaly is false, but it is. We don't know who said it. All we know is there's a footnote in the complaint saying it was a former CBER employee. Well, we have an expert who's a former CBER employee in the contract case. What you're saying is true of all sorts of witnesses. You don't have the opportunity to cross-examine them at the time that their statements are alleged in a complaint, but you get a chance to do so in time for a summary judgment motion, and the same thing would be true of statements of an expert as well as statements of an eyewitness. Both of them are capable of being shown to be false or not reliable and not worthy of trust, and you get to do that at the summary judgment stage if you didn't get to do it. Well, Your Honor, we also get to do it at the motion to dismiss stage in a securities case, because the PSLRA applies, and in Bristol-Myers, this court said, unless the opinion was based on particularized facts sufficient to state a claim for fraud, the court will not consider an expert allegation in a complaint in a securities fraud case. That is binding law in this court, and the Supreme Court is going to adopt that standard, I am confident, in the NVIDIA case. So I'm not saying experts can never be used. What I'm saying is they have to offer particularized facts because the PSLRA applies, and they didn't. And that's a failure on the front of falsity, which the plaintiffs studiously avoid discussing, and scienter, because not only have they failed to plead with specificity why any statement was false, because there was no plan, because the FDA accepted the application, so it wasn't deficient, and the FDA approved the application, so it wasn't deficient, and there was no failure to prepare the facilities because the allegations themselves show that the Lonza employees, who were the confidential witnesses, said that BMS was overbearing. They were berating the employees because they said that Lonza wasn't working hard enough, given all the money BMS was spending, to get the facility ready. How do you square that with an inference that there was a plan to scuttle approval? There just simply wasn't one. But, Your Honor, the breach of contract claim is in another court. Well, I think the inference is not a plan to scuttle approval. It's an inference that the plan is to minorly delay approval, right? Right, Your Honor, but that, again, like, that's a breach of contract claim. The breach of contract, by the way, the only statement in the entire complaint that mentions diligent efforts is the quote of the definition of diligent efforts in the registration statement, which was dated February 22, 2019. The milestone date was December 31, 2020. Not one of the claims in the securities fraud count is based on a statement that says we're going to use diligent efforts. Not one. The statements say we're working with the FDA. You agreed to use diligent efforts, right? In the contract, and that's a contract claim. That's not a claim that the statements are false. None of the statements say we're using diligent efforts. We're working hard with our diligent efforts. They say we're working with the FDA, just like every FDA case that this court has considered. Acido versus Insera. Did they have an obligation in Acido to disclose that they were going to get an instruction after the FDA inspected the facility for a third time to shut it down? No, they didn't have to disclose that, even though there had been two previous inspections, because they didn't need to be clairvoyant. All they had to do was tell the truth about what they knew at the time, and there is no allegation in this complaint that the defendants here, Dr. Coforio and Dr. Hirawat and the company said anything that was inconsistent with what they knew or what they honestly believed at any time between the closing of the merger, which was November 20th, 2019, and the license sale milestone date, which was December 31st, 2020, a year and a month later. In fact, what it shows is that BMS was candid. It kept the market informed of developments. When it received the major amendment letter from the FDA on the license sale application, which delayed the approval timeline by three months, it disclosed it that day. When the PDUFA date came on November 16th and the FDA deferred action, it disclosed that that day. When it learned that the FDA was unable to schedule an inspection before the PDUFA date because of COVID, and therefore that we all understood there was a shrinking amount of time before that milestone date, it didn't hide that fact. It disclosed it. It discussed it in the quarterly earnings call. This is a company that was being candid. The idea that one can draw a plausible inference that people were engaged in securities fraud I find surprising. It's not even close to plausible. It's not a question of balance. Thank you, Your Honor. I'll respond briefly. This is a securities case. It may also be a breach of contract case for some other people, but the CVRs were publicly traded securities. These are false misleading statements about those publicly traded securities, including at the very end of the class period, the press release, the companies committed to working with the FDA to progress both applications to achieve the remaining regulatory milestones required by the CVR. As to this being an expert-driven analysis. What was the date of that statement? November 16, 2020. As to this being an expert-driven analysis, we laid out facts. We said these are the other drugs during the same time period that were also biologics, and we laid out exactly the times that they were approved by and how long it took. The lifestyle took longer than any of them. Yes, we also did a statistical analysis to show the statistically significant, but you can eyeball those numbers and say this number is bigger than all the other numbers. And the fact that we have an expert who also said that these were atypical, that's totally permissible. Under Bristol-Myers, you're allowed to bolster your allegations with an expert's non-conclusory opinion. That's what we did. We didn't contradict our pleadings. We bolstered them. Bristol-Myers says we can do that, and so will the Supreme Court in NVIDIA. And finally, the information – Matt, can I ask just – I want to – the November 16 statement that you read, the company is committed to working with the FDA to progress both applications and achieve the remaining regulatory milestones required by the – if it said that and it added, but we think it more likely than not that we won't meet the milestones, would that be false? It would be less false. I think it – Wasn't that essentially the initial assessment, if it rated – if it anticipated only a 45% chance of approval, of meeting the milestones? I think that's – Isn't that kind of built in throughout since that was the initial assessment? I think that's actually a really important point because that assessment itself is very false and misleading. 45% of $6.4 billion is – and these are people doing this evaluation – is worth around $3 billion, a little below $3 billion. If the market knew that they were slow rolling it, so the chances were dramatically lower than that, maybe zero, that's a $3 billion difference. The likelihood of – the market thought it was getting a fair shake. It was trying to evaluate whether Bristol, using its normal abilities, would be able to get these over the finish line. Now, in COVID time and all those other things, what the market was not taking into account was Bristol not acting with the diligence it had promised, not telling the market what it was going to do. So that 45% was very misleading. The 45% statement was made prior to COVID, wasn't it? It was when the deal was closed. I think that was – I'm not sure if that was prior to COVID. I don't remember the date of when COVID fully hit. But if the intentionality was there to deliberately make it go below 45%, then that's a false misleading statement. People are paying – it's a very simple equation. 45 times $6.4 billion to get a present item. So why initially did you answer me when I phrased it as more likely than not that we won't meet it, that it was less false? Because you're getting close to the truth, which is that they're not going to make it. And you're giving them more of a warning that they're not going to make it. So I'm assuming that the truth is we know we're not going to make it. And if we say, oh, we're on track to make it, that's farther away than saying we're probably not going to make it, even though that's still false misleading because you know you're not going to make it. It's the difference in degree. I think we're on track to make it communicates a higher likelihood than 45%. Exactly, yes. So they're closer, and they also have much more information at this point in time. At the beginning, you still have a lot to go through in the process. At the end, you're a couple – you're weeks away from the date. So you should have a pretty darn good idea whether you're going to make it or not at that point in time. Thank you so much, Your Honors. Thank you, and we will take the matter under advisement.